AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| CARLOS BELONE, | ) | Case No. |
| | ) | 20-6264-SNOW |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

FILED BY __jz__ D.C.
**Jul 6, 2020**
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __March 2018-June 2020__ in the county of __Broward__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1343 | Wire Fraud |
| 18 U.S.C. 1349 | Conspiracy to Commit Health Care Fraud |
| 42 U.S.C. 1320a-7b(b)(2)(A) | Payment of Health Care Kickbacks |
| 18 U.S.C. 1014 | False Statements to a Financial Institution and SBA |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

_____
Complainant's signature

Curtis Collison, Special Agent, HHS-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: July 6, 2020

_____
Judge's signature

City and state: Fort Lauderdale, Florida

Lurana S. Snow, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Curtis Collison, being duly sworn, hereby depose and state as follows:

1.	I am a Special Agent at the Department of Health and Human Services, Office of the Inspector General ("HHS-OIG"), where I have been employed since 2002. I am presently assigned to the Health Care Fraud Strike Force in Miami, Florida. My current duties include the investigation of financial crimes including bank fraud, wire fraud, and health care fraud. During the course of my career with HHS-OIG, I have investigated numerous financial crimes involving fraud, including Medicare fraud perpetrated by durable medical equipment "DME" companies.

2.	Throughout the course of my career, I have conducted an array of criminal investigations involving money laundering, bank fraud, public corruption, organized crime, and many other illegal schemes impacting financial institutions. I have experience conducting search, seizure and arrest warrant operations. Recently, I have been assigned to work with the U.S. Department of Justice and other law enforcement partners to investigate possible fraud associated with the stimulus and economic assistance programs created by the federal government in response to the COVID-19 pandemic.

3.	This affidavit is submitted in support of a criminal complaint charging CARLOS BELONE ("BELONE") with 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1349 (Conspiracy Commit Health Care Fraud), 42 U.S.C. §1320a-7b(b)(2)(A) (Payment of Health Care Kickbacks), and 18 U.S.C. § 1014 (False Statements to a Financial Institution).

4.	This affidavit is based on my personal knowledge and investigation by others, including federal and local law enforcement officials whom I know to be reliable and trustworthy. The facts contained herein have been obtained by interviewing witnesses and examining documents obtained in the course of the investigation as well as through other means. This

affidavit does not include every fact known to me about this investigation, but rather only those facts sufficient to establish probable cause.

## FACTS ESTABLISHING PROBABLE CAUSE

5. As described below, investigation has revealed that BELONE was part of a conspiracy to submit false and fraudulent claims for reimbursement to Medicare for medically unnecessary items and services, and furthermore, that BELONE paid illegal bribes and kickbacks in return for doctors' orders that were used to justify claims for reimbursement to Medicare. BELONE was an owner of at least two Medicare providers that were used to accomplish this scheme: R&S Pharmacy Inc. ("R&S Pharmacy") and R&S DME Services, LLC ("R&S DME Services"). Medicare data shows that R&S Pharmacy submitted claims for $5,013,296 for durable medical equipment ("DME") between approximately May 2018 and December 2019. Medicare paid approximately $2,293,670. Medicare data shows that R&S DME Services submitted claims for approximately $682,681 for DME between approximately July 2019 and January 2020. Medicare paid approximately $242,741. BELONE was a signatory or co-signatory on the majority of the accounts that received these funds from Medicare.

6. The investigation further revealed that, in or around April 2020, after the emergence of the COVID-19 pandemic, BELONE made false and fraudulent representations in three (3) separate applications for Paycheck Protection Program ("PPP") loans on behalf of R&S Pharmacy, and submitted false and fraudulent tax records in connection with these applications. BELONE submitted these false and fraudulent applications to Lender 1 and Lender 2. While Lender 1 rejected BELONE's loan applications, Lender 2 approved his request for a PPP loan and disbursed funds to an account controlled by BELONE. Instead of using these funds for payroll relief and other purposes, as BELONE represented to Lender 2 on the PPP loan application, BELONE,

among other things: (1) transferred at least $12,000 of the PPP loan funds into a personal bank account; and (2) used at least $3,000 to pay a company known to law enforcement to provide doctors' orders in return for kickbacks, to potentially further the fraud scheme.

**I. The Medicare Fraud, Wire Fraud, and Kickback Scheme**

The Medicare Program

7. The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

8. Medicare was divided into multiple program "parts." Medicare Part B covered physician services and outpatient care, including an individual's access to durable medical equipment ("DME"), such as orthotic devices and wheelchairs.

9. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b), and a "federal health care program" as defined by Title 42, United States Code, Section 1320a-7b(f).

10. DME companies and other health care providers that provided services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit an application in which the providers agreed to comply with all Medicare-related laws and regulations. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number." A healthcare provider with a Medicare provider

number could file claims with Medicare to obtain reimbursement for services rendered to beneficiaries.

11. Enrolled Medicare providers agreed to abide by Medicare's policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers were required to abide by the Anti-Kickback Statute and other laws and regulations. Providers were given access to Medicare manuals and service bulletins describing billing procedures, rules, and regulations.

12. Medicare reimbursed DME companies and other healthcare providers for items and services rendered to beneficiaries. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare electronically, through interstate wires, either directly or through a billing company.

13. A Medicare claim for DME reimbursement was required to set forth, among other things, the beneficiary's name and unique Medicare identification number, the DME provided to the beneficiary, the date the DME was provided, the cost of the DME, and the name and unique physician identification number of the physician who prescribed or ordered the equipment.

14. A claim for DME submitted to Medicare qualified for reimbursement only if it was medically necessary for the treatment of the beneficiary's illness or injury and prescribed by a licensed medical professional. Medicare would not pay a claim for DME for which a doctor's order had been procured through kickbacks.

15. I know, from my training and experience, that DME related fraud schemes are a common type of Medicare fraud in South Florida and elsewhere. As part of such schemes, DME companies enroll in the Medicare Program and use their provider numbers to submit claims for reimbursement for medically unnecessary DME. In order to increase the volume of DME claims

submitted for reimbursement, such DME companies – either directly or through intermediary "marketing" or telemedicine companies – often pay illegal bribes and kickbacks to doctors working for telemedicine companies, who are willing to prescribe DME even when not medically warranted, and in some cases, without even examining the Medicare beneficiaries or establishing true doctor-patient relationships.  Sometimes, rather than paying the doctors and medical professionals directly, such DME companies pay illegal bribes and kickbacks to "marketing companies" that serve as intermediaries, and enter sham "marketing agreements" with such individuals, whose sole function in the scheme is to accept kickbacks from DME companies in return for procuring doctors' orders.  These fraudulently obtained doctors' orders, in turn, are used by the DME companies to generate a large volume of billing to Medicare in relatively short periods of time.  Such DME companies, based on my training and experience, often have little overhead expenses and employ minimal staff.

## II. R&S Pharmacy and R&S DME Services

16. R&S Pharmacy is a Florida corporation that was established on or about February 22, 2016 with a principal place of business in Broward County, in the Southern District of Florida.

17. R&S DME Services is a Florida Corporation that was established on or about April 30, 2018 with a principal place of business in Broward County, in the Southern District of Florida.

18. R&S Pharmacy and R&S DME Services were enrolled as Medicare providers. BELONE signed Medicare enrollment forms for R&S Pharmacy on or about September 13, 2017. As part of the R&S Pharmacy Medicare application, BELONE agreed, among other things, to abide by all Medicare rules and regulations, and not to submit claims for payment to Medicare with deliberate ignorance or reckless disregard for their truth or falsity.  On or about March 26, 2018, BELONE submitted an application to enroll R&S Pharmacy as a DME provider.  As part of

that application, BELONE again agreed, among other things, to abide by Medicare rules and regulations, and not to submit claims for payment to Medicare with deliberate ignorance or reckless disregard for their truth or falsity. The enrollment documents BELONE signed also notified BELONE that false and fraudulent claims may be subject to civil and criminal penalties, and furthermore, that payment and receipt of kickbacks was a federal crime.

19. According to Medicare records, BELONE was added as an owner and director/officer of R&S DME Services on or about May 3, 2018. On or about August 14, 2019, BELONE filed an Assignment of Delegated Official form in which he again agreed, among other things, to abide by Medicare rules and regulations, and not to submit claims for payment to Medicare with deliberate ignorance or reckless disregard for their truth or falsity.

20. Medicare data shows that R&S Pharmacy submitted claims for $5,013,296 for DME between approximately May 2018 and December 2019. Medicare paid approximately $2,293,670.

21. Medicare data shows that R&S DME Services submitted claims for approximately $682,681 for DME between approximately July 2019 and January 2020. Medicare paid approximately $242,741.

22. As described more fully below, multiple referring physicians who prescribed the DME for which R&S Pharmacy submitted claims to Medicare are cooperating with the government, and have informed investigators that they signed doctors' orders for medically unnecessary DME in exchange for kickbacks.

Information Provided by Cooperator 1

23. In or around June 2020, law enforcement agents interviewed Cooperator 1, a "marketer" based in the Southern District of Florida. Cooperator 1 stated that, between in or

around May 2018 until in or around October 2018, Cooperator 1 sold BELONE doctors' orders for DME, which BELONE used to submit false and fraudulent claims to Medicare.

24.     Cooperator 1 explained to investigators that Cooperator 1 obtained doctors' orders that were generated by Telemedicine Company A.  Cooperator 1 reported that BELONE paid him between $150 and $325 for each doctor's order, depending on the type of brace prescribed.

25.     Telemedicine Company A is a telemedicine company known to law enforcement to be engaged in the sale of doctors' orders.  Witness statements obtained by law enforcement have indicated that Telemedicine Company A pays telemedicine physicians to sign doctors' orders for DME regardless of medical necessity, often without speaking to the patients for whom they are prescribing the DME.  Telemedicine Company A then sells signed doctors' orders to "marketing" companies who broker the doctors' orders to DME companies.

26.     Cooperator 1 provided agents with bank records showing that R&S Pharmacy paid Cooperator 1's company approximately $340,650 between in or around June 2018 and in or around August 2018.  Many of these funds were transferred via interstate wire.  Cooperator 1 stated that he/she did not provide any services or work to R&S Pharmacy or BELONE, and that he/she was simply paid to provide doctors' orders for DME.

27.     Cooperator 1 further explained that, to conceal the nature of the illegal payments from R&S Pharmacy, Cooperator 1 and BELONE executed a sham contract that falsely described that Cooperator 1 would provide legitimate "marketing" services for R&S Pharmacy at an agreed-upon rate of $50,000 per month.  Based on my training and experience, these sorts of sham contracts are commonly used by DME companies engaged in fraud, in order to conceal the illegal purchase of doctors' orders.

28.     Cooperator 1 provided investigators with a ledger that documents the doctors' orders that Cooperator 1's Company sold to R&S Pharmacy. The ledger contains a tab labeled "RS," which identifies the name of the patient, the patient's Medicare number and the brace type, and the price per doctor's order for each order that Cooperator 1 sold to R&S Pharmacy. Contrary to the $50,000 flat fee contained in the sham contract, the ledger illustrates that R&S Pharmacy paid Cooperator 1 per doctor's order that Cooperator 1 supplied to R&S Pharmacy.

29.     In late 2018, Cooperator 1 visited the premises of R&S Pharmacy and R&S DME Services, which Cooperator 1 described as a largely empty storefront. Based on my training and experience, a largely empty storefront is a red flag that a DME company is operating as a telemarketing fraud and not as a legitimate DME Company.

## Information Provided by Cooperating Physicians

30.     Telemedicine Physician A is a physician who worked for Telemedicine Company A and who is cooperating with law enforcement. Telemedicine Physician A informed investigators that he/she signed doctors' orders for DME through Telemedicine Company A regardless of medical necessity, often without speaking with patients. Telemedicine Physician A explained that Telemedicine Company A would supply him/her with pre-filled prescriptions for DME, to which he/she simply needed to add his/her electronic signature. Medicare claims data for R&S Pharmacy reflects that R&S Pharmacy submitted approximately $43,314 in claims to Medicare for DME that was prescribed by Telemedicine Physician A. Telemedicine Physician A was charged with and pleaded guilty to conspiracy to commit health care fraud and was sentenced to 18 months' imprisonment.

31.     Telemedicine Physician B is a physician who is cooperating with law enforcement and who worked for several telemedicine companies known to law enforcement to have been

engaged in the illegal sale of doctors' orders. Telemedicine Physician B informed investigators that he/she signed doctors' orders for DME regardless of medical necessity, often without speaking to patients. Medicare claims data for R&S Pharmacy reflects that R&S Pharmacy submitted approximately $31,351 in claims to Medicare for DME that was prescribed by Telemedicine Physician B. Telemedicine Physician B was charged with and pleaded guilty to conspiracy to commit health care fraud and is pending sentencing.

### Information Provided by R&S Patients

32. Between approximately June 2018 and March 2020, over 100 Medicare beneficiaries contacted a Medicare fraud hotline to file a complaint concerning R&S Pharmacy and/or R&S DME Services. Based on my training and experience, this volume of complaints is common with DME companies that are abusing Medicare beneficiaries' billing information for profit.

33. Investigators spoke to several Medicare beneficiaries on behalf of whom R&S Pharmacy and/or R&S DME submitted claims to Medicare for reimbursement for DME. Beneficiaries generally told investigators that they did not want or need DME, and that they did not authorize their Medicare insurance numbers to be used to submit claims for DME.

34. For example, in or around July 2019, R&S DME Services submitted claims for six separate orthotic braces on behalf of patient M.E. M.E. told investigators that he/she did not want or need any orthotic braces. M.E. recalled that he/she was contacted by a telemedicine physician offering him/her orthotic braces in or around July 2019, but informed the physician that he/she did not want or need any braces. Shortly thereafter, M.E. received a package containing orthotic braces from R&S Pharmacy. M.E. promptly returned the package to R&S Pharmacy. M.E. was

never a customer of R&S Pharmacy and had otherwise never visited and never heard of R&S Pharmacy.

35. Similarly, in or around September 2019, R&S DME Services submitted claims for six separate orthotic braces on behalf of patient N.A. N.A. told investigators that he/she received several braces, but that he/she immediately returned them because he/she did not want or need them. Medicare claims data for R&S DME Services reflects that the braces were prescribed by physician L.S. Patient N.A. told investigators that he/she had never spoken to physician L.S.

36. In or around April 2019, R&S Pharmacy submitted claims for six separate orthotic braces on behalf of patient F.M. F.M. told investigators that he/she did not receive any sort of orthotic brace, and that he/she has never wanted nor needed a brace. Medicare claims data for R&S Pharmacy reflects that the braces were prescribed by physician N.D. Patient F.M. told investigators that he/she had never spoken to physician N.D.

37. In or around April and June 2018, R&S Pharmacy submitted claims for over six separate orthotic braces on behalf of patient R.S. R.S. told investigators he/she did not receive any sort of orthotic brace, and that he/she has never wanted nor needed a brace. R.S. told investigators that he/she had never authorized his Medicare number to be used to submit a claim for an orthotic brace. Medicare claims data for R&S Pharmacy reflects that the braces were prescribed by physician J.K. R.S. told investigators that he/she had never spoken to physician L.M. Medicare paid R&S Pharmacy approximately $2,553 for claims based on DME purportedly provided to R.S.

38. Based on my training and experience, submitting a claim for numerous orthotic braces for a single patient is part of a fraudulent practice called "upselling," in which a DME company attempts to bill Medicare for as many braces as possible on behalf of a single beneficiary. This is a red flag that the DME company is submitting claims for medically unnecessary DME,

because, barring an unusual situation (for example, where a patient has been in a car accident), a single patient is unlikely to require multiple types of orthotic braces at one time.

39. Medicare revoked R&S Pharmacy's enrollment on February 24, 2020.

40. On or about March 1, 2020, R&S DME Services submitted a request to voluntarily withdraw from the Medicare Program.

**III. The PPP Scheme and False Representations Made to Lender 1 and Lender 2**

The Paycheck Protection Program

41. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program (defined previously as "PPP"). In or around April 2020, over $300 billion in additional PPP funding was authorized by Congress.

42. In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

43. A PPP loan application must be processed by a participating financial institution (the lender). If a PPP loan application is approved, the participating financial institution funds the PPP loan using its own monies, which are 100% guaranteed by Small Business Administration (SBA). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

44. PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

R&S Pharmacy SBA Loan Applications to Lender 1

45. On or about April 2, 2020, after Medicare revoked R&S Pharmacy's enrollment, BELONE signed an application for a PPP loan in the amount of $30,000 on behalf of R&S Pharmacy. Through the loan application, BELONE certified that R&S Pharmacy's average monthly payroll was $12,000. This application was submitted to Lender 1, a U.S. bank whose deposits were insured by the Federal Deposit Insurance Corporation ("FDIC").

46. On or about April 18, 2020, BELONE signed an application for a PPP loan in the amount of $20,000 on behalf of R&S Pharmacy. Through the loan application, BELONE certified that R&S Pharmacy employed three employees and its average monthly payroll was $8,000. This application was also submitted to Lender 1.

47. In each of these applications, BELONE further certified that all of the information provided in the application, and in all supporting documents, was true and accurate, and BELONE

understood that knowingly making a false statement to obtain a guaranteed loan from the SBA, if submitted to a federally insured institution, was punishable under 18 U.S.C. § 1014.

48. In support of the loan applications, BELONE submitted several tax documents to Lender 1 which, based upon my review, appear to be falsified. For example, BELONE submitted to Lender 1 a Form 940 for R&S Pharmacy for the year 2019, which identifies total payments to all employees as $94,022.[1] The version submitted to Lender 1 was signed by BELONE. In contrast, I have obtained from the IRS the actual Form 940 submitted by R&S Pharmacy for the year 2019. The Form 940 submitted to the IRS identifies the total payments to all employees as $41,222.57 (less than half of the amount reported on the Form 940 submitted by BELONE to Lender 1).

49. Employees of Lender 1 who reviewed the application determined that the tax documents supplied by BELONE appeared to be "made up." Accordingly, Lender 1 denied the loan applications submitted by BELONE for R&S Pharmacy.

### R&S Pharmacy SBA Loan Application to Lender 2

50. On or about April 8, 2020, BELONE signed a third application for a PPP loan in the amount of $22,500 on behalf of R&S Pharmacy, and submitted this application to Lender 2, a second lender that was offering PPP loans. Through the loan application, BELONE certified that:

    a. R&S Pharmacy employed three employees and its average monthly payroll was $9,000.

    b. All loan proceeds would be used only for business-related purposes, which BELONE stated would be payroll, lease/mortgage, or utilities expenses.

---

[1] IRS Form 940 is used to report an employer's federal annual unemployment tax returns.

      c. R&S Pharmacy was not engaged in any activity that is illegal under federal, state, or local law.

      d. All of the information provided in the application, and in all supporting documents, was true and accurate, and BELONE understood that knowingly making a false statement to obtain a guaranteed loan from the SBA was punishable under the law.

51. In support of the loan application, BELONE submitted to the bank several tax documents which, based upon my review, appear to be falsified. In pertinent part, the tax documents differ in significant respects from the tax documents that R&S Pharmacy filed with the IRS. For example, BELONE submitted a Form 940 for R&S Pharmacy for the year 2019, electronically signed by BELONE, which identifies total payments to all employees as $94,022. As discussed above, the actual Form 940 for the year 2019 that was submitted to the IRS was not signed by BELONE and identifies the total payments to all employees as $41,222.57.

52. On or about May 6, 2020, BELONE electronically signed an SBA Loan Note in which he expressly agreed that all certifications, authorizations, and representations made in the PPP Application Form "remain true and accurate as of the date of this Note" and that the proceeds of the loan would be used for payroll; rent; or utilities cost, and that no part of the proceeds would be used for personal purposes.

53. Based on the application submitted by BELONE to Lender 2, the PPP loan was approved by Lender 2. Loan proceeds were then disbursed through an FDIC-insured institution working in partnership with Lender 2, into an account ending in x7998 at Lender 1 in the name of R&S Pharmacy, over which BELONE had signatory authority.

Banking and Florida Department of Revenue Wage Analysis

54. Records obtained from the Florida Department of Revenue do not identify any wages paid by R&S Pharmacy in 2020. Additionally, Florida Department of Revenue records reflect that R&S Pharmacy has only paid wages to two employees, and that R&S Pharmacy's wages for the last three quarters of 2019 were less than half of what BELONE reported in the PPP Applications.

55. Banking records for R&S Pharmacy similarly reflect wage payments to two employees, S.I. and D.R, for the years 2019 and 2020. Department of Revenue and banking data reflect that D.R. has not received payment from R&S Pharmacy since October 2019. R&S Pharmacy paid S.I. approximately $655 in January 2020 and approximately $800 in May 2020.

56. With the exception of the approximately $800 paid to S.I. in May 2020, none of the R&S Pharmacy PPP loan proceeds appear to have been used for payroll, rent, or utilities as represented by BELONE in the loan application.

57. Instead, following the deposit of PPP funds, funds were transferred as follows:

  a. Approximately $12,000 was placed into a personal account in the name of BELONE.

  b. Approximately $3,060 was transferred via wire payment to Telemedicine Company B, a telemedicine company that is known to law enforcement. Telemedicine Company B advertises that it provides "97% conversions." Based on my training and experience, this means that Telemedicine Company B generates doctors' orders for 97% of patients referred to Telemedicine Company B, a strong red flag that physicians are signing doctors' orders regardless of medical necessity.

## CONCLUSION

58. Based on my training and experience, and the information provided in this affidavit, I respectfully submit that there is probable cause to believe that beginning on a date unknown, from at least in or around September 2017, and continuing until the present, within the Southern District of Florida, and elsewhere, BELONE committed violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1349 (Conspiracy Commit Health Care Fraud), 42 U.S.C. §1320a-7b(b)(2)(A) (Payment of Health Care Kickbacks), and 18 U.S.C. § 1014 (False Statements to a Financial Institution). I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

*FURTHER AFFIANT SAYETH NAUGHT.*

Special Agent Curtis Collison
HHS-OIG

Sworn to and subscribed before me
telephonically this __6th__ day of July, 2020.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

16